IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| DIGIMEDIA TECH, LLC, | |
| Plaintiff, | |
| | CIVIL ACTION |
| v. | NO. 2:24-cv-300 |
| ARASHI VISION INC. d/b/a INSTA360, | |
| Defendant. | **Jury Trial Demanded** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff DigiMedia Tech, LLC ("Plaintiff") files this Complaint for Patent Infringement and states as follows:

### THE PARTIES

1.      Plaintiff is a limited liability company organized and existing under the laws of the State of Georgia, having its principal office at 44 Milton Ave., Suite 254, Alpharetta, GA 30009.

2.      On information and belief, Defendant Arashi Vision Inc. d/b/a Insta360 is a corporation organized and existing under the laws of China.

### JURISDICTION AND VENUE

3.      This Court has exclusive subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a) on the grounds that this action arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285.

4.      This Court has personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long

Arm Statute. On information and belief, Defendant has, directly or through subsidiaries or intermediaries, committed acts of patent infringement in the State of Texas and in this Judicial District as alleged in this Complaint. Moreover, on information and belief, Defendant has purposefully and voluntarily placed its products into the stream of commerce with the expectation that they will be purchased and used by customers located in the State of Texas. On information and belief, Defendant's customers in the State of Texas have used Defendant's infringing products.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) on the grounds that Defendant is a foreign corporation.

## FACTUAL BACKGROUND

**The '086 Patent**

6.     Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 6,567,086 entitled "Immersive Video System Using Multiple Video Streams" ("the '086 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

7.     A true and correct copy of the '086 patent is attached hereto as Exhibit A. The '086 patent is incorporated herein by reference.

8.     The application that became the '086 patent was filed on July 25, 2000.

9.     The '086 patent issued on May 20, 2003, after a full and fair examination by the USPTO.

10.      The '086 patent is and is legally presumed to be valid, enforceable, and directed to patent-eligible subject matter.

11.     The elements recited in the claims of the '086 patent were not well-understood, routine, or conventional when the application that became the '086 patent was filed.

12.     The '086 patent identifies technological shortcomings existing in the art prior to the '086 patent. *See, e.g.*, '086 patent at 2:48-67; 4:7-12. As expressed in the '086 patent, the inventions disclosed and claimed in the '086 patent overcome such technological shortcomings. *Id*. at 3:1-22; 4:12-17; 9:36-44. The Detailed Description of the '086 patent contains additional detail that would assist a person of ordinary skill in the art in understanding the scope of the claimed invention and to implement them without undue experimentation. *Id*. at 4:17-9:34.

13.     The claims of the '086 patent are directed to technical solutions to the technical problem of how to increase the resolution and quality of immersive video for environment display systems that use multiple video streams and conventional video components. One of the reasons this is important is that, for camera systems with 360 degrees of view, users may prefer to view video at different angles with higher resolution. The video display system may not "know" or be set to a preferred angle for the users when the camera system starts processing video.

14.     Supporting higher resolution views for user selectable angles from a camera with a 360-degree field of view calls for technical solutions. The '086 patent discloses and claims such technical solutions. For example, an immersive video system can produce a plurality of video streams using associated environment data, and a user can select a preferred video stream. First environment data, such as camera settings, can be shared between the plurality of video streams to reduce data processing or data storage requirements. Second environment data, such as directional audio, can be for a first video stream, where the second environment data does not overlap another video stream. This approach overcomes a problem in which using the same

3

environment data for all views results in lower quality. Consequently, the technology in the '086 patent enables both efficient operation while also supporting preferred user features, such as selecting a view angle with higher resolution from the 360-degree field of view.

15.     The steps set forth in the claims of the '086 patent provide a technical solution to the technical problem of supporting high quality views for user selectable angles from a camera with a 360-degree field of view.

16.     For example, claims 1, 2, and 7 of the '086 patent claim:

1. An immersive video system for displaying a view window of an environment, the immersive video system comprising:

a video source configured to produce a plurality of video streams;

a video decoder coupled to the video source and configured to decode an active video stream; and

an immersive video decoder coupled to the video decoder and configured to select the active video stream from the plurality of video streams;

wherein each of the plurality of video streams includes environment data for recreating a viewable range of the environment, the environment data for each video stream including first data that overlaps at least one other video stream and second data that does not overlap the at least one other video stream.

2. The immersive video system of claim 1, wherein the environment encompasses 360 degrees of viewing angle.

7. The immersive video system of claim 1, further comprising a view control interface coupled to the immersive video decoder.

17.     The steps set forth in the claims of the '086 patent constitute patent-eligible subject matter, is not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more inventive concepts for accomplishing the goal of accurate and automated information exchange.

18.     The steps set forth in the claims of the '086 patent were not well-understood, routine, or conventional at the time of the invention. This is evidenced, for example, by the '086 patent's assertions, including those referenced herein, that the disclosed and claimed inventions improved upon technological shortcomings in the existing art.

19.     That the steps set forth in the claims of the '086 patent were not well-understood, routine, or conventional at the time of the invention is further evidenced by the fact that the inventor of the '086 patent submitted a sworn declaration, subject to penalty for willful false statements, that "I believe I am the original, first and sole inventor . . . of subject matter . . . that is disclosed and/or claimed and for which a patent is solicited by way of the application entitled 'Video System Using Multiple Video Streams.'"

20.     That the steps set forth in the claims of the '086 patent were not well-understood, routine, or conventional at the time of the invention is further evidenced by the prosecution history of the '086 patent. The U.S. Patent & Trademark Office has stated that the duties of a Patent Examiner include the following:

• Reads and understands the invention set forth in the specification
• Determines whether the application is adequate to define the metes and bounds of the claimed invention
• Determines the scope of the claims
• Searches existing technology for claimed invention
• Determines patentability of the claimed invention

Exhibit G at 11, *The Role of the Patent Examiner*, Sue A. Purvis, Innovation and Outreach Coordinator, USPTO, available at

https://www.uspto.gov/sites/default/files/about/offices/ous/04082013_StonyBrookU.pdf.

21.     Thus, the Examiner who examined the '086 patent, in accordance with his duties, (1) read and understood the invention set forth in the specification; (2) determined whether the application was adequate to define the metes and bounds of the claimed invention; (3)

determined the scope of the claims; (4) searched existing technology for the inventions recited in the claims of the application; and (5) determined the patentability of the claims.

22.    The Examiner performed these duties in his role as "advocate/protector of [the] public interest with respect to intellectual property," which involves a "cooperative investigation between the Examiner and the Applicant, which ensures an Applicant receives a patent only for that which they are entitled to in accordance with Patent laws." *Id.* at 8-9.

23.    After conducting an examination of the claims of the application underlying the '086 patent, the Examiner determined that the claims of the '086 patent were allowable over the art of record, including, for example, U.S. Patent No. 6,360,000. As set forth above, the '086 patent identifies shortcomings in the prior art. Had the Examiner determined that the claims of the '086 patent merely recited well-understood, routine, or conventional components, he would not have allowed the claims over the art of record, including the art discussed in the '086 patent's specification and the art reviewed by the Examiner during prosecution. The fact that the Examiner did allow the claims shows that he did not determine that the claims of the '086 patent merely recited well-understood, routine, or conventional components.

24.    The significance of the inventiveness of the '086 patent is illustrated by the fact that it has been cited in 27 other patent applications, including the following patents and published patent applications: US20030016228A1; US6654019B2; US6747647B2; US20040169663A1; US20060248570A1; US20060268102A1; US20070126932A1; US20070126864A1; US20070126938A1; US20070141545A1; US20070174010A1; US20080018792A1; US20080288876A1; US20090067813A1; US20090184981A1; US20100017047A1; US20140229609A1; CN104244019A; US9183560B2; US20160156705A1;

US20170084073A1; US20170084086A1; WO2018046705A3; WO2018223241A1;

EP3440843A4; US10616551B2; and US10628019B2.

25.     These public documents and their related prosecution histories are incorporated

herein by reference and provide concrete proof that the invention claimed and disclosed in the

'086 patent was not well-understood, routine, or conventional at the time of the invention.

**The '250 Patent**

26.     Plaintiff is the owner by assignment of all right, title, and interest in and to United

States Patent No. 6,741,250 entitled "Method and System for Generation of Multiple Viewpoints

into a Scene Viewed by Motionless Cameras and for Presentation of a View Path" ("the '250

patent"), including the right to sue for all past, present, and future infringement, which

assignment was duly recorded in the USPTO.

27.     A true and correct copy of the '250 patent is attached hereto as Exhibit B. The

'250 patent is incorporated herein by reference.

28.     The application that became the '250 patent was filed on October 17, 2001.

29.     The '250 patent issued on May 25, 2004, after a full and fair examination by the

USPTO.

30.     The '250 patent is and is legally presumed to be valid, enforceable, and directed

to patent-eligible subject matter.

31.     The elements recited in the claims of the '250 patent were not well-understood,

routine, or conventional when the application that became the '250 patent was filed.

32.     The '250 patent identifies shortcomings in the art as it existed before the '250

patent. *See, e.g.,* '250 patent at 2:20-37; 2:45-58. The '250 patent also identifies desirable

improvements to the existing art. *Id.* at 2:38-44; 2:59-62. The '250 patent improves upon these

shortcomings in the art as it existed prior to the invention of the technical solutions disclosed and claims in the '250 patent.

33.     The claims of the '250 patent are directed to technical solutions to the technical problem of using a single camera to provide a view path through one or more video segments to determine which video frames in the video segments are used to generate a view. One of the reasons this is important is that users of a camera with a wide field of view may prefer to select and view (or have selected for them) only portions of the supported wide field of view. The camera's field of view may be sufficiently wide to create distorted images on a rectangular screen. Users may prefer portions with reduced distortion, which calls for technical solutions. The '250 patent discloses and claims such technical solutions. The camera can record a video stream over the wide field of view. The camera and/or a user can designate a portion of the video stream to be a video segment and subsequently designate a view path through the video segment. Consequently, the technology in the '250 patent enables the view of portions of the camera's wide field of view with reduced distortion.

34.     For example, claim 1 of the '250 patent claims:

1. A method of:

recording a video stream comprising a plurality of frames, wherein said plurality of frames define a plurality of distorted images;

designating a portion of said video stream to be a video segment; and

specifying a view path through said video segment.

35.     The steps set forth in claim 1 of the '250 patent provide a technical solution to the technical problem of providing view paths without distortion.

36.     The steps set forth in the claims of the '250 patent constitute patent-eligible subject matter, is not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more inventive concepts for providing view paths without distortion.

37.     The steps set forth in the claims of the '250 patent were not well-understood, routine, or conventional at the time of the invention. This is evidenced, for example, by the '250 patent's assertions, including those referenced herein, that the disclosed and claimed inventions improved upon technological shortcomings in the existing art.

38.     That the steps set forth in the claims of the '250 patent were not well-understood, routine, or conventional at the time of the invention is further evidenced by the fact that the inventors of the '250 patent submitted sworn declarations, subject to penalty for willful false statements, that "I/we believe that I/we am/are the original and first inventor(s) of the subject matter which is claimed and for which a patent is sought."

39.     That the steps set forth in the claims of the '250 patent were not well-understood, routine, or conventional at the time of the invention is further evidenced by the prosecution history of the '250 patent. The U.S. Patent & Trademark Office has stated that the duties of a Patent Examiner include the following:

- Reads and understands the invention set forth in the specification
- Determines whether the application is adequate to define the metes and bounds of the claimed invention
- Determines the scope of the claims
- Searches existing technology for claimed invention
- Determines patentability of the claimed invention

Exhibit G at 11, *The Role of the Patent Examiner*, Sue A. Purvis, Innovation and Outreach Coordinator, USPTO, available at

https://www.uspto.gov/sites/default/files/about/offices/ous/04082013_StonyBrookU.pdf.

40.     Thus, the Examiner who examined the '250 patent, in accordance with his duties, (1) read and understood the invention set forth in the specification; (2) determined whether the application was adequate to define the metes and bounds of the claimed invention; (3) determined the scope of the claims; (4) searched existing technology for the inventions recited in the claims of the application; and (5) determined the patentability of the claims.

41.     The Examiner performed these duties in his role as "advocate/protector of [the] public interest with respect to intellectual property," which involves a "cooperative investigation between the Examiner and the Applicant, which ensures an Applicant receives a patent only for that which they are entitled to in accordance with Patent laws." *Id.* at 8-9.

42.     After conducting an examination of the claims of the application underlying the '250 patent, the Examiner determined that the claims of the '250 patent were allowable over the art of record. As set forth above, the '250 patent identifies shortcomings in the prior art. Had the Examiner determined that the claims of the '250 patent merely recited well-understood, routine, or conventional components, he would not have allowed the claims over the art of record, including the art discussed in the '250 patent's specification and the art reviewed by the Examiner during prosecution. The fact that the Examiner did allow the claims shows that he did not determine that the claims of the '250 patent merely recited well-understood, routine, or conventional components.

43.     The significance of the inventiveness of the '250 patent is illustrated by the fact that it has been cited in 153 other patent applications, including the following patents and published patent applications: US20020196327A1; US20030193562A1; US20030234866A1; US20040001137A1; US20040233222A1; US20040263636A1; US20040263611A1; US20040263646A1; US20040267521A1; US20050018687A1; US20050046626A1;

US20050046703A1; US20050117034A1; US20050117015A1; US20050122393A1;

US20050151837A1; US20050180656A1; US20050190768A1; US20050206659A1;

US20050243167A1; US20050243168A1; US20050243166A1; US20050280700A1;

US20050285943A1; US20060023075A1; US20060022962A1; US20060092269A1;

US7108378B1;  US20060268102A1; US20070022379A1; US20070058879A1;

US20070124783A1; US20070156924A1; US20070165007A1; US7260257B2;

US20070299912A1; US20070299710A1; US20070300165A1; US20080008458A1;

US20080049123A1; US20080068352A1; US20080117296A1; US20080129700A1;

US20080291279A1; US20080317451A1; US20090079740A1; US20090160801A1;

US7593057B2; US20090305803A1; US7643006B2; US20100110005A1; US20100254670A1;

WO2010127418A1; US20110043628A1; US20110095977A1; US20110128387A1;

USRE42794E1; US8055022B2; US20110298917A1; US8089462B2; USRE43084E1;

US8094137B2; US8115753B2; US8120596B2; US8149221B2; US8274496B2; US8289299B2;

US8384693B2; US20130063427A1; US8405636B2; US8432377B2; US8456447B2;

US8456418B2; US8508508B2; US8692768B2; US8902193B2; US20150042815A1;

US9294757B1; US9591272B2; US9646444B2; US9674181B2; US20170214889A1;

US9942520B2; US10129569B2; US10156706B2; WO2019017695A1; US10225479B2;

US10230898B2; US10250889B1; US10250797B2; US10281979B2; US10284780B2;

US10288840B2; US10288897B2; US10288896B2; US10291845B2; US10371928B2;

US10379371B2; US10488631B2; US10534153B2; US10578948B2; US10615513B2;

US10616484B2; US10635931B2; US10645286B2; US10694168B2; US10706518B2;

US10845565B2; US10871561B2; US10884321B2; US10904512B2; USRE48444E1;

US10951834B2; US10951859B2; US10955546B2; US10976567B2; US11037364B2;

US11272154B2; US11268829B2; US11277596B2; US11287081B2; US11315276B2;

US11333955B2; US11363180B2; US11368631B1; US11378682B2; US11506778B2;

US11525910B2; US11531209B2; US11635596B2; US11637977B2; US11640047B2;

US11659135B2; US11693064B2; US11770618B2; US11770609B2; US11832018B2;

US11900966B2; US11910089B2; US11949976B2; US11946775B2; and US11962901B2.

44.     These public documents and their related prosecution histories are incorporated herein by reference and provide concrete proof that the invention claimed and disclosed in the '250 patent was not well-understood, routine, or conventional at the time of the invention.

**The '476 Patent**

45.     Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 7,715,476, entitled "System, Method and Article of Manufacture for Tracking a Head of a Camera-Generated Image of a Person" ("the '476 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

46.     A true and correct copy of the '476 patent is attached hereto as Exhibit C. The '476 patent is incorporated herein by reference.

47.     The application that became the '476 patent was filed on April 21, 2005.

48.     The '476 patent claims priority to an application filed on July 30, 1999.

49.     The '476 patent issued on May 11, 2010, after a full and fair examination by the USPTO.

50.     The '476 patent is and is legally presumed to be valid, enforceable and directed to patent-eligible subject matter.

51.     The elements recited in the asserted claims of the '476 patent were not well-understood, routine, or conventional when the application that became the '476 patent was filed.

52.     The '476 patent states that "[t]he present invention relates to displaying video images generated by a camera on a display, and more particularly to tracking a head portion of a person image in camera-generated video images." '476 patent at 1:41-44. The '476 patent observes that it is important to track a head portion of the user image since this specific body part is often the focus of the most attention. '476 patent at 1:63-65.

53.     The '476 patent identifies a problem in the state of the art as it existed at the time of filing: "Many difficulties arise, however, during the process of identifying the current position of the head portion of the user image. It is often very difficult to discern the head portion when relying on a single technique. For example, when identifying the location of a head portion using shape, color, motion etc., portions of the background image and the remaining body parts of the user image may be confused with the head. For example, a flesh coloring of a hand may be mistaken for features of the head." '476 patent at 1:65-2:7.

54.     The claims of the '476 patent are directed to technical solutions to the technical problem of how to identify a head in an image, and in particular a solution to the problem in the state of the art identified by the '476 patent. One of various reasons this is important is to assist in focusing a digital camera. Since many camera users are not trained in how to properly focus a camera, and because many photographs are candid shots of moving subjects, the problem calls for technical solutions. The '476 patent discloses and claims such technical solutions.

55.     For example, the '476 patent recognized that while a number of different techniques could be used to identify a head portion of a subject in an image, no single technique is foolproof. Thus, the '476 patent discloses applying at least two techniques to identify a head

portion and basing the detection of heads on the results of the two techniques. This approach overcomes a problem that any particular technique may be fooled by or rendered inapplicable by particular circumstances (e.g., lighting conditions, orientation of the subject to the camera, etc.). *See, e.g.,* '476 patent at 5:36-53 ("The first confidence value and the second confidence value may then be made available for use by various applications in operation **204**. Such applications may decide whether the head portion of the person image has moved based on the confidence values. Logic such as an AND operation, an OR operation, or any other more sophisticated logic may be employed to decide whether the results of the first head tracking operation and/or the second head tracking operation are indicative of true head movement. For example, if at least one of the head tracking operations indicates a high confidence of head movement, it may be decided to assume that the head has moved. On the other hand, if both head tracking operations indicate a medium confidence of movement, it may be assumed with similar certainty that the head has moved. If it is decided to assume that the head has moved, an interaction may be shown between the video images generated by the camera and the virtual computer-generated environment."); *see also* '476 patent at 6:66-7:7.

56.    For example, claim 13 (which depends from and incorporates the elements of claim 1) of the '476 patent claims:

> 1. A method performed by a computer for processing images to identify a head portion of a subject in the images comprising:
>
> obtaining images of a subject;
>
> generating, by the computer, a first confidence value representing a confidence that a first process has identified a location of a head portion of the subject in the images;
>
> generating, by the computer, a second confidence value representing a confidence that a second, different process has identified the location of the head portion of the subject in the images; and

identifying, by the computer, the location of the head portion of the
subject in the images based at least in part on the first confidence value
and the second confidence value.

13. A method as recited in claim 1, wherein the first process includes
identifying a point of separation between the head portion and a torso
portion.

57.     The steps set forth in claim 13 of the '476 patent provide a technical solution to

the technical problem of head portion focus. Claim 13 does not merely claim a result. Rather, in

keeping with the nature of method claims, claim 13 recites steps. Those steps do not merely

claim the technical benefit (or results) of the inventions disclosed in the '476 patent. Rather,

claim 13 recites steps that, if performed, will result in those technical benefits. For example,

claim 13 recites steps that, if performed, will address at least the following issue with the state of

the art identified in the '476 patent: "Many difficulties arise, however, during the process of

identifying the current position of the head portion of the user image. It is often very difficult to

discern the head portion when relying on a single technique. For example, when identifying the

location of a head portion using shape, color, motion etc., portions of the background image and

the remaining body parts of the user image may be confused with the head. For example, a flesh

coloring of a hand may be mistaken for features of the head." '476 patent at 1:65-2:7.

58.     Moreover, the specification of the '476 patent contains a great deal of additional

detail regarding preferred embodiments for practicing the claimed invention. '476 patent at 4:56-

11:9, including preferred embodiments of processes for identifying head portions in images. This

additional description would help a person of ordinary skill in the art understand and implement

the technological solutions claimed in the '476 patent.

59.     Other claims of the '476 patent recite additional features that provide further

technological benefits. For example, claim 5 of the '476 patent recites "wherein the first process

includes analyzing pixels within a search window, wherein the search window is created based

on a previously identified head portion." As an additional example, claim 11 recites "wherein the first process includes generating a mass distribution, wherein local maxima of the mass distribution are used to identify a person image." As a further example, claim 12 recites "wherein the first process includes generating a mass distribution, wherein local maxima of the mass distribution in the context of a previously identified person image are used to identify a person image."

60.     The steps set forth in the claims of the '476 patent constitute patent-eligible subject matter, are not directed to an abstract idea, law of nature, or natural phenomenon, and contain one or more inventive concepts for focusing a digital camera.

61.     The steps set forth in the claims of the '476 patent was not well-understood, routine, or conventional at the time of the invention. This is evidenced by the fact that the inventors of the '476 patent submitted sworn declarations, subject to penalty for willful false statements, that "I believe that I am . . . an original, first and joint inventor . . . of the subject matter which is claimed and for which a patent is sought on the invention."

62.     That the invention recited in claims 5, 11, 12, and 13 of the '476 patent were not well-understood, routine, or conventional at the time the '476 patent was filed is also evidenced by the Examiner's actions in the prosecution of the '476 patent.

63.     The Examiner who examined the '476 patent (1) read and understood the invention set forth in the specification; (2) determined whether the application was adequate to define the metes and bounds of the claimed invention; (3) determined the scope of the claims; (4) searched existing technology for the inventions recited in the claims of the application; and (5) determined the patentability of the claims. *See* Exhibit G.

64.     The Examiner performed these duties in his role as "advocate/protector of [the] public interest with respect to intellectual property," which involves a "cooperative investigation between the Examiner and the Applicant, which ensures an Applicant receives a patent only for that which they are entitled to in accordance with Patent laws." *Id.* at 8-9.

65.     The Examiner initially rejected application claims 1-33 under 35 U.S.C. § 101. The applicants overcame these rejections by addressing the Examiner's concerns regarding § 101. The applicants also overcame other rejections by the Examiner over the art of record, prompting the Examiner to allow claims 5, 11, 12, and 13 of the '476 patent (among others).

66.     The Examiner allowed claims 5, 11, 12, and 13 of the '476 patent after a full and fair investigation. Had the Examiner determined, after his review of the art of record and his knowledge of the state of the art, that the subject matter recited in claims 5, 11, 12, and 13 was well-understood, routine, or conventional at the time of the invention, he would not have allowed the claims to issue.

67.     The significance of the inventiveness of the '476 patent is illustrated by the fact that it or a family member has been cited in 157 other patent applications, including the following patents and published patent applications: JP4157234B2; US8711217B2; US8564661B2; US9892606B2; US20050162515A1; US7020305B2; US20020085738A1; US7424175B2; US8457401B2; US20020171742A1; US6870945B2; US8300042B2; US7259747B2; US8035612B2; US6968085B2; US20030107650A1; US7710391B2; US7161579B2; US8947347B2; US7623115B2; US8797260B2; US7102615B2; US7646372B2; US7883415B2; US7760248B2; US7803050B2; US8570378B2; US9393487B2; US8686939B2; US7854655B2; US9474968B2; US8313380B2; US8139793B2; US7627139B2; US8233642B2; US7850526B2; US8160269B2; US9174119B2; US7918733B2; US9682319B2; US7134080B2;

JP4240957B2; JP4318465B2; WO2004055776A1; US9177387B2; US7505862B2;

US8072470B2; US8498452B2; US8593542B2; US7565030B2; US7440593B1; US8989453B2;

US8155397B2; US8330831B2; US7574016B2; US9692964B2; US8948468B2; US9129381B2;

US8896725B2; US7792970B2; US7269292B2; US8494286B2; US7471846B2; US7844076B2;

US7620218B2; US8682097B2; US20070223732A1; US9573056B2; US8287373B2;

US7874917B2; US8323106B2; US10279254B2; WO2005041579A2; CN1902930B;

US7663689B2; US8345918B2; GB2414615A; US8547401B2; US8320641B2; US7386150B2;

US8503800B2; US7315631B1; US9128519B1; JP4654773B2; US8081822B1; US7796780B2;

US8098277B1; US20070133940A1; US8265392B2; US8265349B2; US8150155B2;

KR100660725B1; US20110014981A1; AT497218T; WO2008017051A2; US7403643B2;

US7916897B2; US8310656B2; US8781151B2; USRE48417E1; AU2006252252B2;

US8055067B2; US8300890B1; WO2008104549A2; WO2008107002A1; US20080232696A1;

US20080252596A1; JP2008282085A; US7916971B2; US8702430B2; US8221290B2;

US8360904B2; KR100904846B1; WO2009035705A1; US8159682B2; US8542907B2;

WO2009094646A2; CN103258184B; US8340379B2; US8259163B2; US8368753B2;

US7855737B2; US8595218B2; US20090312629A1; JP5547730B2; US8961313B2;

US11464578B2; US8690776B2; US8641621B2; US8554307B2; US8527657B2;

US8342963B2; US8393964B2; US8142288B2; US8379917B2; US8787663B2; US9582707B2;

US9100574B2; US8670816B2; JP6222795B2; US10314559B2; US10347100B2;

US9901406B2; US10188467B2; US10853625B2; US10551913B2; WO2016181469A1;

JP6566028B2; US9949700B2; US9675319B1; US10278778B2; US11259879B2;

US10469590B2; US11484365B2; US11037316B2; US11205274B2; and JP6973258B2.

68.     These public documents and their related prosecution histories are incorporated herein by reference and provide concrete proof that the invention claimed and disclosed in the '476 patent was not well-understood, routine, or conventional at the time of the invention.

## COUNT I – INFRINGEMENT OF THE '086 PATENT

69.     Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

70.     Defendant has directly infringed one or more claims of the '086 patent. For example, Defendant has infringed at least claim 24 of the '086 patent, either literally or under the doctrine of equivalents, in connection with Defendant's Insta360 X2 Camera, as detailed in the preliminary claim chart attached hereto as Exhibit D and incorporated herein by reference.

71.     Defendant has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '086 patent. On information and belief, Defendant has performed all steps of this claim or, alternatively, to the extent a user performed any step, Defendant conditioned the user's use of the functionality of Defendant's accused instrumentalities (e.g., Defendant's Insta360 X2 Camera) described herein on the performance of that step as disclosed in Exhibit D. The accused functionality relates to the accused products' video processing functionality, as set forth in Exhibit D. On information and belief, a user of the accused instrumentalities could not use the functionality described in Exhibit D without performance of the steps recited in claim 24 of the '086 patent. Defendant also controlled the manner and/or timing of the functionality described in Exhibit D. In other words, for a user to utilize the video processing functionality described in Exhibit D, the steps of claim 24 of the '086 patent had to be performed in the manner described in Exhibit D. Otherwise, the video processing functionality of the accused instrumentalities, and the corresponding benefit, would not have been available to users of the accused instrumentalities.

72.     Defendant's infringing activities have been without authority or license under the '086 patent.

73.     Because the asserted claim of the '086 patent is a method claim, the marking requirement of 35 U.S.C. § 287 does not apply. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

74.     Plaintiff has been damaged by Defendant's infringement of the '086 patent, and Plaintiff is entitled to recover damages for Defendant's infringement, which damages cannot be less than a reasonable royalty.

## COUNT II – INFRINGEMENT OF THE '250 PATENT

75.     Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

76.     Defendant has directly infringed one or more claims of the '250 patent. For example, Defendant has infringed at least claim 1 of the '250 patent, either literally or under the doctrine of equivalents, in connection with Defendant's Insta360 X2 Camera, as detailed in the preliminary claim chart attached hereto as Exhibit E and incorporated herein by reference.

77.     Defendant has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '250 patent. On information and belief, Defendant has performed all steps of this claim or, alternatively, to the extent a user performed any step, Defendant conditioned the user's use of the functionality of Defendant's accused instrumentalities (e.g., Defendant's Insta360 X2 Camera) described herein on the performance of that step as disclosed in Exhibit E. The accused functionality relates to the accused products' video processing functionality, as set forth in Exhibit E. On information and belief, a user of the accused instrumentalities could not use the functionality described in Exhibit E without performance of the steps recited in claim 1 of the '250 patent. Defendant also controlled the

manner and/or timing of the functionality described in Exhibit E. In other words, for a user to utilize the video processing functionality described in Exhibit E, the steps of claim 1 of the '250 patent had to be performed in the manner described in Exhibit E. Otherwise, the video processing functionality of the accused instrumentalities, and the corresponding benefit, would not have been available to users of the accused instrumentalities.

78.    Defendant's infringing activities have been without authority or license under the '250 patent.

79.    Because the asserted claim of the '250 patent is a method claim, the marking requirement of 35 U.S.C. § 287 does not apply. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

80.    Plaintiff has been damaged by Defendant's infringement of the '250 patent, and Plaintiff is entitled to recover damages for Defendant's infringement, which damages cannot be less than a reasonable royalty.

## COUNT III – INFRINGEMENT OF THE '476 PATENT

81.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

82.    Defendant has directly infringed one or more claims of the '476 patent. Defendant has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '476 patent.

83.    For example, Defendant has infringed at least claim 13 of the '476 patent, either literally or under the doctrine of equivalents, in connection with at least its Insta360 Link, as detailed in the preliminary claim chart attached hereto as Exhibit F and incorporated herein by reference.

84.     Moreover, on information and belief, Defendant has performed all steps of this claim or, alternatively, to the extent a user performed any step, Defendant conditioned the user's use of the functionality of Defendant's accused instrumentalities described herein on the performance of that step as disclosed in Exhibit F. The accused functionality relates to the head-tracking functionality and corresponding hardware of the accused products (e.g., Defendant's Insta360 Link), as set forth in Exhibit F. For example, on information and belief, a user could not use the functionality of the accused instrumentality as described in Exhibit F without performance of the steps recited in claim 13 of the '476 patent. Defendant also controlled the manner and/or timing of the functionality described in Exhibit F. In other words, for a user to utilize the functionality described in Exhibit F, the steps of claim 13 of the '476 patent had to be performed in the manner described in Exhibit F. Otherwise, the head-tracking functionality of Defendant's accused instrumentalities (and the corresponding benefit) would not have been available to users.

85.     Because the asserted claims of the '476 patent are method claims, the marking requirement of 35 U.S.C. § 287 does not apply to them. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

86.     Defendant's infringing activities have been without authority or license under the '476 patent.

87.     Plaintiff has been damaged by Defendant's infringement of the '476 patent, and Plaintiff is entitled to recover damages for Defendant's infringement, which damages cannot be less than a reasonable royalty.

### **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

A.    Entry of judgment that Defendant has infringed one or more claims of the '086 patent,

B.    Entry of judgment that Defendant has infringed one or more claims of the '250 patent,

C.    Entry of judgment that Defendant has infringed one or more claims of the '476 patent,

D.    Damages in an amount to be determined at trial for Defendant's infringement, which amount cannot be less than a reasonable royalty, and an accounting of all infringing acts, including but not limited to those acts not presented at trial,

E.    A determination that this case is exceptional, and an award of attorney's fees,

F.    All costs of this action,

G.    Pre-judgment and post-judgment interest on the damages assessed, and

H.    Such other and further relief, both at law and in equity, to which Plaintiff may be entitled and which the Court deems just and proper.

This 1st day of May, 2024.

/s/ *Cortney S. Alexander*
Daniel A. Kent
  dankent@kentrisley.com
  Tel: (404) 585-4214
  Fax: (404) 829-2412
Cortney S. Alexander
  cortneyalexander@kentrisley.com
  Tel: (404) 855-3867
  Fax: (770) 462-3299
KENT & RISLEY LLC

5755 N Point Pkwy Ste 57
Alpharetta, GA 30022

Attorneys for Plaintiff